**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| LOUDOUN HEIGHTS, LLC | ) | Case No. 13-15588-BFK |
| | ) | Chapter 11 |
| Debtor | ) | |

**OPINION AND ORDER**
**DENYING MOTION TO DISMISS AND**
**GRANTING DEBTOR'S MOTION FOR**
**APPROVAL OF SETTLEMENT**

This matter is before the Court on the Motion of Little Piney Run Estates, LLC

(hereinafter, "LPR"), to dismiss the Debtor's bankruptcy case. Docket No. 95. LPR claims that

the person who signed the Debtor's Voluntary Petition, Joseph Bane, Jr., lacked the corporate

authority to do so. The Debtor has filed an Opposition to the Motion. Docket No. 107. The Court

heard evidence on the Motion on June 5, 2014.

The matter is also before the Court on the Debtor's Motion for Approval of a Settlement

with its secured lender, M&T Bank. Docket No. 136 (the "Settlement Motion"). M&T signed the

Motion. LPR opposes the settlement. Docket No. 157. The Court also heard evidence on the

Settlement Motion on June 5, 2014.[1]

For the reasons stated below, the Court will deny the Motion to Dismiss, and will grant

the Motion for Approval of the Settlement.

---

[1]   There is a great deal of overlap in the evidence on the Motion to Dismiss and on the Settlement Motion. Hence,
the Court will issue a single Opinion and Order for both Motions.

1

## Findings of Fact

Having heard the evidence, the Court makes the following findings of fact:

*A. Loudoun Heights and LPR.*

1.      Loudoun Heights, LLC ("Loudoun Heights") is a Virginia limited liability company, established in November 2007. LPR Ex. 5, p.1. There are two members of Loudoun Heights – LPR, with a 93% membership interest, and the Robert and Dee Leggett Foundation, with a 7% membership interest. *Id.*, Ex. A.

2.      LPR also is a Virginia limited liability company, established in 2006. LPR Ex. 1. It has three members – Joseph L. Bane, Jr., with a 51% membership interest, Jerome O. Guyant IRA, with a 24.5% membership interest, and Dean F. Morehouse, with a 24.5% membership interest. *Id.*, Ex. A.

3.      Loudoun Heights' initial Operating Agreement appointed Mr. Bane and Robert Leggett as Managers of the LLC, by unanimous consent of the members. LPR Ex. 5, ¶ 3.1 The same provision of the Operating Agreement requires the written consent of 75% of the members to designate a new Manager, in the event of a resignation or removal of a Manager. *Id.*

4.      Section 3.2 of the initial Operating Agreement for Loudoun Heights provides as follows:

> Except for specific consent rights of Members as set forth below, the Managers shall have complete control and exclusive control of the management of the business and affairs of the LLC, and the Members, in their capacities as members, shall have no right to participate in the management of the conduct of the LLC's business and affairs nor any power or authority to act for or on behalf of the LLC in any respect whatsoever. Except as otherwise specifically provided in this Operating Agreement, the Managers shall have the right, power and authority on behalf of the LLC in its name to exercise all of the rights, powers and authority of the LLC under the Act, subject to any express limitations set forth herein. It is expressly understood and agreed that, notwithstanding anything herein to the contrary, either Manager, acting alone and without the vote or consent of the

other Manager, may take any action (including without limitation the execution of any
document or instrument) or make any decision required or permitted herein or under the
Act to be taken by the Managers of the LLC.

*Id.*, ¶ 3.2.

5.      Section 3.2 further provides that the written consent of at least 66% of the

Membership Interests at a meeting held after 5 business days' written notice, or the written

waiver of all Members, is required for, among other things, the "mortgage, pledge, grant [of] a

security interest in or other encumbrance or collateral assignment of the Property or any other

assets of the LLC." *Id*., ¶ 3.2(ii).

6.      LPR's original Operating Agreement (February 2006) and its Amended and

Restated Operating Agreement (May 2007) both contain the identical language from Section 3.2

of the Loudoun Heights Operating Agreement quoted above. LPR Ex. 1, ¶ 3.2; LPR Ex. 2, ¶ 3.2.

And, as in the Loudoun Heights initial Operating Agreement, both the original Operating

Agreement and the Amended and Restated Operating Agreement for LPR require either the

unanimous written consent of the Members or the approval of 66% of the Members, after five

business days' notice of a meeting, to "encumber" LPR's property. LPR Ex. 1, ¶ 3.2(ii); LPR Ex.

2, ¶ 3.2(ii).

        B.  *The Loudoun Heights Properties.*

7.      Loudoun Heights is a curious amalgam of two disparate sets of interests,

represented by its two sets of properties. On the one hand, LPR contributed five separate parcels

of unimproved real property totaling 166 acres, more or less (for ease of reference, these

properties will be referred to as the LPR properties, even though they are now owned by

Loudoun Heights).[2] These parcels are zoned for agricultural use, but have the potential to be re-zoned and developed into building lots for residential development, with lot sizes of not less than five acres under the County's cluster development zoning scheme. M&T Ex. 9, pp. 22-23. Three of the LPR properties are to the east of Harper's Ferry Road (State Route 671). *Id.*, Addendum B Property Information. Two of the LPR properties (tax map PIN472460191 and PIN472450316) are to the west of Harper's Ferry Road. *Id.* Parcel 2 (PIN472460191) has road frontage on Harper's Ferry Road, and further, adjoins the 313 acre parcel (discussed below). *Id.*

8.      On the other hand, the Leggett Foundation contributed a 313 acre parcel of unimproved property to Loudoun Heights.[3] This parcel has the potential to be contributed to Loudoun County or to the Commonwealth of Virginia for a park. The 313 acre parcel is landlocked, which is to say it does not have any access to a road at this point. *Id.* In order for Loudoun Heights to gain legal access to this parcel, it either needs to grant an access easement over one of the LPR parcels (PIN472460191, one of the parcels to the west of Harper's Ferry Road), or Loudoun Heights would need to initiate legal proceedings against one of its neighbors in order to establish an easement by necessity.[4]

9.      The initial Operating Agreement and the Amended Operating Agreement (discussed below) for Loudoun Heights permit LPR and the Leggett Foundation to repurchase

---

[2]  The tax map PIN numbers for these parcels are: 472485830, 472460191, 472364047, 472474146 and 472450316.

[3]  The tax map PIN number for this parcel is 507173739.

[4]  Both the original Operating Agreement and the Amended and Restated Operating Agreement for Loudoun Heights actually recite that the Leggett Foundation contributed an 89% interest in the 313 acres as its initial capital contribution to Loudoun Heights. *See* LPR Ex. 5 (Ex. A to Operating Agreement) and Debtor Ex. J (Ex. A to Amended and Restated Operating Agreement). It is not known who owns the remaining 11% interest in the 313 acre parcel. The Court also was advised at the hearing that the Debtor does not own the timber rights to the 313 acre parcel.

the properties that they contributed for the sum of $1.00 each. LPR Ex. 5, ¶ 2.4; Debtor's Ex. J, ¶ 2.4. [5]

C.  *Mr. Bane's Dissociation as a Member of LPR.*

10.    On February 28, 2011, Mr. Bane filed a voluntary petition under Chapter 11 with this Court. (*In re Bane*, Case No. 11-11426-RGM). As a result, Mr. Bane was dissociated as a member from LPR, though he retained his 51% membership interest in LPR. Va. Code § 13.1-1040.1(6)(a).

11.    Mr. Bane does not dispute that he is a dissociated member of LPR. Mr. Bane's bankruptcy case remains pending before this Court.

D.  *The Termination of LPR's Corporate Existence, its Dissociation as a Member of Loudoun Heights, and its Reinstatement.*

12.    On December 31, 2010, LPR's existence was terminated by the Virginia State Corporation Commission for its failure to file annual reports and to pay its annual registration fees. As a result, LPR was dissociated as a member of Loudoun Heights. Va. Code § 13.1-1040.1(12).

13.    LPR's existence remained terminated for a period of three years and four months. It was reinstated on April 13, 2014. LPR Ex. 30.

E.  *The M&T Loans to LPR, and to Loudoun Heights.*

14.    On February 15, 2006, M&T Bank made a $3.3 million loan to LPR. M&T Ex. 1. The loan was secured by a Purchase Money Credit Line Deed of Trust and an Assignment of Interests, Contracts, Plans and Permits, against the five LPR properties. M&T Exs. 2 and 3.

---

[5]  This is actually denominated as paragraph 2.3 of the Amended and Restated Operating Agreement, but there are two Sections 2.3, so the Court will identify this paragraph as Section 2.4.

15.     Subsequently, LPR contributed the five properties to Loudoun Heights.

16.     On February 27, 2008, M&T made a loan to Loudoun Heights in the principal

amount of $3,700,000. The loan was evidenced by a Purchase Money Credit Line Deed of Trust

Note, and was secured by a Purchase Money Credit Line Deed of Trust and an Assignment of

Interests, Contracts, Plans and Permits against the five LPR properties contributed to Loudoun

Heights. M&T Exs. 4, 5 and 6.

17.     The proceeds of the M&T loan to Loudoun Heights were used to pay off the loan

to LPR. M&T Ex. 8 (HUD-1 Settlement Statement, Line 1501, $3,250,924.68 "Payoff of first

mortgage loan, M&T Bank").

18.     M&T has filed a secured proof of claim in this case in the amount of

$4,411,073.46. M&T Ex. 10.[6]

19.     The Court heard the testimony of M&T's appraiser, Mr. Kerr of Integra Realty, as

to the value of the LPR parcels. Mr. Kerr's testimony was unrebutted by any conflicting

valuation testimony. The five LPR parcels together have an appraised fair market value in the

amount of $2,000,000. M&T Ex. 9, p. 2.[7]

*F.  The Amendment to the Loudoun Heights Operating Agreement.*

20.     On or about April 8, 2014 (the Agreement says that it is "made effective as of"),

the Leggett Foundation, acting as the sole Member of Loudoun Heights with voting rights,

executed an Amended Operating Agreement for Loudoun Heights. Debtor's Ex. J. The Amended

---

[6] A timely filed proof of claim that is not objected to carries a prima facie presumption as to validity and amount. Bankruptcy Rule 3001(f).

[7] LPR does not contest the amount of M&T's proof of claim, nor does it contest the fact that M&T is greatly undersecured.

Operating Agreement contains the same paragraph 3.2 quoted above from the original Operating

Agreement, with a number of significant changes: first, the Amended Operating Agreement now

requires 100% of the voting members of Loudoun Heights to approve any encumbrances against

Loudoun Heights' properties or to take any of the other fundamental corporate actions described

therein. *Id.*, ¶ 3.2(ii).[8]

21.     Second, Mr. Bane was appointed as the sole Manager in the Amended Operating

Agreement. *Id.*, ¶ 3.1. Further, the removal of Mr. Bane as Manager now requires the affirmative

vote of 100% of the voting members. *Id.*

22.     Third and finally, any further amendments to the Operating Agreement likewise

will require the vote of 100% of the members. *Id.*, ¶ 10.2.

*G.  The Original Stream Credit Agreement and the Declaration.*

23.     Piney Run is a stream located in northwestern Loudoun County, Virginia. It flows

in a northeastern direction, into the Potomac River (which then flows into the Chesapeake Bay).

Three of the LPR properties, over which Piney Run flows, are within the Piney Run drainage

basin of the Potomac River watershed. Debtor's Ex. D (Site Development Plan), p. 1. As such,

they are eligible for inclusion in a stream mitigation bank.[9]

---

[8]  LPR did not suggest during the hearing that the Amended Operating Agreement was executed by the Leggett
Foundation after LPR was reinstated by the State Corporation Commission on April 13, 2014. LPR had the chance
for discovery in advance of the hearing in this matter, so the Court assumes that there is no basis for such an
assertion.

[9]  "A mitigation bank is a site where resources (e.g., wetlands, streams, riparian areas) are restored, established,
enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts authorized by
Department of the Army permits. The U.S. Army Corps of Engineers regulates resources like wetlands and streams
under Section 404 of the Clean Water Act and in some cases Section 10 of the Rivers and Harbors Act. The measure
of aquatic functions is based on the resources restored, established, enhanced, or preserved."
http://www.sam.usace.army.mil/Missions/Regulatory/Mitigation.aspx (last visited June 18, 2014).

24.     In September 2007, the Mitigation Bank Review Team ("MBRT"), consisting of representatives of the U.S. Army Corps of Engineers, the Environmental Protection Agency, the U.S. Fish and Wildlife Service and the Virginia Department of Environmental Quality, approved an Umbrella Mitigation Banking Instrument for what has become known as the Pipken Site. Debtor's Ex. B. Loudoun Mitigation, LLC, is the Sponsor. *Id.*

25.     As a part of the approval process, Loudoun Mitigation, LLC, as Sponsor, entered into a Site Development Plan for the Pipken Site. Debtor's Ex. D. The Pipken Site consists of approximately 115 acres of land owned by various landowners, and includes the five LPR parcels. *Id*., p. 1. The landowners are obligated: (i) to preserve 10,234 linear feet (LF) of stream on Piney Run, (ii) to enhance approximately 4,500 LF of Piney Run and its unnamed tributaries, and (iii) to restore approximately 2,725 LF of Piney Run and an unnamed tributary. *Id*., pp. 26-27. The Debtor's representative, Mr. Bane, testified that the LPR properties primarily have preservation obligations, as opposed to stream enhancement responsibilities.

26.     Loudoun Mitigation Bank, LLC (hereinafter, "LMB") is a Virginia limited liability company. Mr. Bane's wife, Tamara Klinefelter Bane, owns a 52.7% interest in LMB. LPR Ex. 3, p. 13.[10]

27.     On or about October 2007, LPR entered into a Stream and Wetland Mitigation Development Agreement with Loudoun Environmental Mitigation Service, LLC ("LEMS").

---

[10]  The Amended and Restated Operating Agreement for LMB uses the name "Loudoun Mitigation Bank, LLC," but Exhibit A attached to the same Agreement uses the name "Loudoun Mitigation, LLC." LPR Ex. 3, p. 13. For purposes hereof, the terms "Loudoun Mitigation Bank, LLC" and "Loudoun Mitigation, LLC" are considered to be interchangeable and are designated by the use of "LMB."

LPR Ex. 4.[11] This Agreement would have provided LPR with "no less than $20,000 per acre or

20% gross credit sales price, whichever is greater, for Wetland Mitigation Credits derived within

the Mitigation Area, and/or $100 per Credit or 20% of the gross Stream Mitigation Credit sales

price paid to LEMS, whichever is greater." *Id.*, ¶ 2, p. 1. All of the costs associated with the

establishment and maintenance of the stream would be the responsibility of LEMS. *Id.*, ¶ 3.[12]

28.     The LPR properties thereafter were conveyed to Loudoun Heights.[13]

29.     Shortly thereafter, Loudoun Heights executed and caused to be recorded in the

land records of Loudoun County a Declaration of Restrictions. Debtor's Ex. E; M&T Ex. 23

(hereinafter, the "2008 Declaration"). The 2008 Declaration, recorded on January 9, 2008,

encumbers parcels 472485830, 472364047, and 472474146 (which total approximately 59.4

acres) *Id.*; M&T Ex. 12, p. 1. The purpose of the Declaration is to obligate the owner and its

successors in title to comply with the terms of the Umbrella Mitigation Banking Instrument and

the Site Development Plan.

30.     On August 2, 2010, the Army Corps of Engineers wrote a letter to Mr. Bane,

expressing some concern that "the Bank Sponsor, Loudoun Mitigation LLC, may not have full

---

[11] LPR questions the validity of this Agreement, arguing that it, and the Declaration of Restrictions that followed, were not authorized by the unanimous consent of the members of LPR, nor was it approved after a vote of 66 % of the members after proper notice. *See* LPR Ex. 1 (LPR Operating Agreement), ¶ 3.2. The Debtor argues that it was preceded by a Unanimous Consent of the Members of LPR. M&T Ex. 7. This Resolution, however, is not unanimous, because it lacks Mr. Guyant's signature. Further, it is dated as of May 28, 2009, so it is unlikely that the Unanimous Consent was executed in support of the first Stream Credit Agreement. The Court need not decide this dispute as to the validity of the first Stream Credit Agreement, because the first Stream Credit Agreement has been superceded by the Debtor's proposed Stream Credit Agreement with LMB, discussed below.

[12] A slightly different version of this Agreement, which includes FBJ Real Estate, LLC, as a party, appears at M&T Ex. 21A. FBJ Real Estate filed a Chapter 11 petition with this Court on September 8, 2011. Case No. 11-16606-RGM. The case was dismissed on February 18, 2014.

[13] At the hearing in this matter, LPR conceded that too much time has passed for it to be able to attack the transfer of the LPR properties to Loudoun Heights as an unauthorized transaction by Mr. Bane.

control of the Pipken Site." M&T Ex. 30. The Corps requested information from Mr. Bane, and

advised Mr. Bane that he had 10 days within which to respond "in order to avoid suspension of

credit sales at the Pipken site." *Id.*

31.     On May 31, 2011, the Army Corps of Engineers suspended all credit transactions

from the Pipken Site. M&T Ex. 15 ("we cannot approve continued credit transactions from this

mitigation bank site…. We will not recognize any transactions completed after this date until this

matter has been resolved.") The suspension was lifted on December 16, 2011, as to the Pipken

Site generally, but the credits to be generated by the LPR properties were excluded. M&T Ex.

16, p. 2 ("that would exclude any credits generated by Little Piney Run Estates (LPRE)").[14] The

LPR properties remain suspended from the Pipken Site.

32.     The Court heard the testimony of John Norman, of BlueLine Conservation

Incentives, who was qualified as an expert in eco-systems credits (a description that includes

wetlands banks and stream banks). His expert report was admitted into evidence as M&T's

Exhibit 11. In his report, Mr. Norman states that the Pipken Site was originally approved for

11,190 stream mitigation credits, of which the Loudoun Heights properties are allocated 3,178

credits. M&T Ex. 11, p. 2. Mr. Norman's report further confirms that "the vast majority of stream

credit generation for the LH [Loudoun Heights] lands em[a]nate from preservation." *Id.*

---

[14]  Mr. Stouffer of the Army Corps of Engineers testified on April 4, 2014: "the entire Bank was suspended. The
entire site was suspended and the properties that weren't Loudoun Heights were reinstated." M&T Ex. 34, p. 42. He
further testified that in order to reinstate the Loudoun Heights credits, the dispute between Mr. Bane, Mr. Guyant
and Mr. Moorehouse would have to be resolved. *Id.*, p. 47.

33.     Mr. Norman testified that there has been a pre-release of approximately 15% of the stream credits in this case. He testified that 10% of the credits will need to go into escrow, and the balance of the credits can be monetized over a period of up to 10 years.

34.     Mr. Norman further testified that the currently proposed arrangement of 50% of the stream credits going to Loudoun Heights (after the 10% holdback) was reasonable. In his observation, the highest percentage of stream credit proceeds that he has seen go to landowners has been in the neighborhood of 55 to 60%. He testified that the stream credits are actually owned by LMB, the Sponsor of the site. In his view, the Loudoun Heights stream credits have a value of approximately $300 to $550 per credit.

*H. The Loudoun Heights Bankruptcy Filing.*

35.     Loudoun Heights filed this bankruptcy case under Chapter 11 on December 16, 2013. Docket No. 1. Mr. Bane signed the voluntary petition as the Debtor's "Sole Manager." The petition was accompanied by what purports to be a Resolution authorizing the bankruptcy filing. The Resolution is signed by Mr. Bane as the Sole Manager. *Id.*

36.     On December 27, 2013, the Debtor filed a Motion for Approval of the Sale of Stream Credits to Loudoun Mitigation Bank, LLC (hereinafter, "LMB"). Docket No. 15. M&T objected, as did LPR. Docket Nos. 23 and 25. The Court was advised at the hearing that LMB is essentially the same entity as LEMS, the party with whom the Debtor had entered into the Stream Mitigation Development Agreement described above.

37.     The proposed Stream and Wetland Mitigation Development Agreement would provide the Debtor with "no less than $150 per stream credit or 50% Net credit sales price,

whichever is greater, for Stream Credits derived from within the Mitigation Area." M&T Ex. 21, ¶ 2.

38.    On February 18, 2014, the Debtor filed a Motion to Authorize the Sale of Tax Credits from a Conservation Easement, and a Motion to Authorize the Sale of Tax Credits Resulting from Trail Easements. Docket Nos. 40 and 42. M&T objected. Docket Nos. 69 and 70.

39.    On March 29, 2014, the Debtor filed an Amended Motion to Sell Stream Credits. Docket No. 90. M&T again objected. Docket No. 120.

40.    On April 3, 2014, LPR filed a Motion to Dismiss the bankruptcy case. Docket No. 95. The Debtor objected. Docket No. 107.

41.    On April 30, 2014, the Debtor filed a Motion for Approval of a Settlement Agreement with M&T. Docket No. 136. Loudoun County objected, as did LPR. Docket Nos. 141 and 157.[15] Under the terms of the settlement:

- M&T will be granted relief from the automatic stay as of October 22, 2014, with respect to its collateral.

- The sale of the Debtor's stream bank credits will be authorized.

- There are certain clarifications with respect to the 2008 Declaration, for the benefit of M&T and its collateral.

- M&T will cooperate in the effort to sell the stream credits by, for example, providing a letter to the Army Corps of Engineers in support of the settlement.

---

[15]    Loudoun County's objections were resolved by the agreement of the parties on the record, at the hearing on June 5, 2014.

- There will be a 10% holdback for the bonding required to monetize the stream credits. After the 10% holdback, the Debtor will split the remaining stream credit proceeds with LMB on a 50/50 basis. Of the Debtor's 50% interest (which is actually a 45% interest, when the holdback is considered), M&T will receive 80% and the Debtor will receive 20% for the payment of administrative expenses and potentially for the payment of a distribution to its unsecured creditors. M&T's 80% interest in the proceeds is estimated by the Debtor to amount to $480,000. The Debtor's 20% is estimated to be in the amount of $120,000.

- The Debtor will withdraw with prejudice the Trail Easement Motion and the Conservation Easement Motion as they relate to M&T's collateral.

- M&T will agree to the placement of a 60-foot wide access easement over the one LPR parcel (PIN 472460191) that will enable access to Harper's Ferry Road from the 313 acre parcel.

- M&T will agree to cap its deficiency claim at no more than $2.0 million.

- M&T will agree to the payment of up to $200,000 to unsecured creditors in any confirmed plan, before the payment of its unsecured deficiency claim.

Docket No. 136.

42.     At the hearing on June 5, 2014, the Debtor advised the Court that it will withdraw the Trail Easement Motion and the Conservation Easement Motion without prejudice as to the 313 acre parcel (but, as noted, these Motions will be withdrawn with prejudice as to M&T's collateral, should the Settlement Motion be approved).

13

43.     At present, the Debtor has $49 in its Debtor in Possession operating account. The

Debtor has no present prospects for refinancing its properties with any other lender, and has no

ability to make any adequate protection payments to M&T.

**Conclusions of Law**

The Court has jurisdiction over both Motions pursuant to 11 U.S.C. 1334 and the Order

of Reference of the District Court for this District entered August 15, 1984. Both Motions

present core proceedings under 28 U.S.C. § 157(b)(2)(A) (matters concerning administration of

the estate), and in the in case of the Settlement Motion, § 157(b)(2)(M) (orders approving the use

or lease of property, including the use of cash collateral).

**I.       The Motion to Dismiss.**

Section 1112(b) of the Bankruptcy Code provides that a bankruptcy case may be

dismissed for cause. The authority to file a bankruptcy petition is determined under applicable

State law. *Price v. Gurney*, 324 U.S. 100, 106 (1945). The individual acting on behalf of a

corporation must exercise proper corporate authority as determined by the local state law in order

to file a valid bankruptcy petition. *Hager v. Gibson*, 108 F.3d 35, 39 (4th Cir. 1997) (citing

*Price*, 324 U.S. at 106). If the bankruptcy court finds no such authority under state law, it "has

no alternative but to dismiss the petition." *Id.* Here, the Virginia Limited Liability Company Act

controls as to whether Mr. Bane exercised proper corporate authority to file a valid bankruptcy

on behalf of Loudon Heights, LLC.

LPR was dissociated as a member of Loudoun Heights, when its corporate existence was

terminated on December 31, 2010. Va. Code § 13.1-1040.1(12) (member is dissociated when a

"partnership or limited liability company that is a member has been dissolved and its business is

14

being wound up"). LPR was reinstated on April 13, 2014. In the meantime, the Leggett

Foundation, the only other member of Loudoun Heights, authorized the bankruptcy filing in this

case.

LPR relies on Virginia Code § 13.1-1050.4(C), which provides:

> If the limited liability company complies with the provisions of this section, the
> Commission shall enter an order of reinstatement of existence. Upon entry of the order,
> the existence of the limited liability company shall be deemed to have continued from the
> date of the cancellation as if cancellation had never occurred, and any liability incurred
> by the limited liability company or a member, manager, or other agent after the
> cancellation and before the reinstatement is determined as if cancellation of the limited
> liability company's existence had never occurred.

Va. Code § 13.1-1050.4(C).

In LPR's view, the language "as if the cancellation of the limited liability company's

existence had never occurred" in the statute requires the Court to conclude that the bankruptcy

filing was not authorized because LPR, as the 93% member of the Debtor, never authorized the

filing. The retroactive effect of reinstatement likely would protect the members from personal

liability for the debts of LPR. *See Pannell v. Shannon*, 425 S.W.3d 58, 67-77 (2014) ("This

Court concludes that a member of a limited liability company enjoys statutory immunity from

liability under KRS 275.150 for actions taken during a period of administrative dissolution so

long as the company is reinstated before a final judgment is rendered against the member")

(citing 16A William Meade Fletcher, et al., *Fletcher Cyclopedia of the Law of Private

Corporations* § 8130, at 282-83 ("[T]he reinstatement of a corporation following dissolution by

administrative action of the state ordinarily relates back to the effective date of its dissolution or

suspension. Thus, shareholders of a reinstated corporation generally are not liable for actions

undertaken during a period of dissolution or suspension.")). *See also Syed v. ZH Technologies,*

15

*Inc.,* 280 Va. 58, 69-70, 694 S.E.2d 625, 631-32 (2010) (under Virginia Stock Corporation Act,

reinstatement of a corporation is retroactive and shields officers, directors and agents from

personal liability).

In *Hager*, the Fourth Circuit held that an *unauthorized* bankruptcy petition may be

ratified by post-petition corporate action (or, as happened in *Hager*, inaction by the 50%

shareholder of the corporation). 108 F.3d at 40. But, this is a far cry from requesting that the

Court retroactively ignore a *validly* filed Chapter 11 petition and everything that has occurred

during the course of the case. There is no support in the case law under the Virginia Limited

Liability Company Act for the proposition that the reinstatement of a member causes the undoing

of corporate action validly taken while one of its members was dissociated. Moreover, the

language in the statute upon which LPR relies – "as if cancellation of the limited liability

company's existence had never occurred" – applies in this case to LPR, not to Loudoun Heights.

It may be that LPR's members are shielded from liability upon its reinstatement, but the

retroactive effect of the statute cannot undo valid corporate action by Loudoun Heights, the

corporate existence of which was never terminated.

The Court finds that the Loudoun Heights bankruptcy filing was validly authorized by its

then sole voting member, the Leggett Foundation. The Motion to Dismiss will be denied.

## II.      The Settlement Motion.

Rule 9019 of the Federal Rules of Bankruptcy Procedure provides: "On motion by the

trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed.

R. Bankr. P. 9019(a). In 1968, the Supreme Court charged bankruptcy judges to make an

informed and independent judgment of whether a proposed compromise is fair and equitable

16

before approving a settlement. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968) ("[A bankruptcy judge should] apprise[] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties in collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.")

As Judge Tice of this Court explained in *In re Austin*, 186 B.R. 397 (Bankr. E.D. Va. 1995), the bankruptcy court should consider: (a) the probability of success in litigation; (b) potential collection struggles; (c) the complexity, time and expense involved in litigating the matter; and (d) the interests of the creditors. 186 B.R. at 400 (citing *Fireman's Fund Ins. Co. v. Woodson (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988); *American Can Co. v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 605, 607 (5th Cir. 1980); *In re Culmtech, Ltd.*, 118 B.R. 237, 238 (Bankr. M.D. Pa. 1990)). "In essence, the court must determine whether the settlement falls 'below the lowest point in the range of reasonableness.'" *Id.* (citing *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *Official Comm. of Unsecured Creditors v. James Talcott, Inc. (In re International Distribution Ctrs., Inc.)*, 99 B.R. 529, 531-32 (S.D.N.Y. 1989)).

"[T]he nature of a bankruptcy case imparts upon the bankruptcy court a duty to scrutinize settlements in a more exacting manner than would be warranted in a two party context." *In re Merry-Go-Round Enterprises, Inc.*, 229 B.R. 337, 347 (Bankr. D. Md. 1999). A settlement between a chapter 11 debtor and one of its creditors, not only concerns the two parties, but affects all other creditors in the case, as well as the reorganization of the debtor going forward.

17

*See In re Gordon Properties, LLC*, 2013 WL 4510582, at *1 (Bankr. E.D. Va. 2013). *See also*

*Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 473 (6th Cir. 1988) ("The court is

not permitted to act as a mere rubber stamp or to rely on the trustee's word that a compromise is

'reasonable.' . . . The need for this safeguard is obvious. Any settlement between the debtor and

one of his individual creditors necessarily affects the rights of other creditors by reducing assets

of the estate available to satisfy other creditors' claims.")

LPR raises three issues in opposition to the settlement. The Court will address each issue,

in turn.

*A.  The Settlement is in the Best Interests of the Creditors and the Estate.*

The Court is called upon to determine the fairness of the proposed settlement. LPR

argues first that, if LMB owns the stream credits, then M&T cannot have a valid security interest

in LMB's property. In effect, LPR argues that the settlement should not be approved because the

effect of the settlement is to give away 80% of the Debtor's share of the stream credits proceeds

to a party that has no secured interest in those proceeds, M&T. The Court questions LPR's

standing to make this argument, though, because LPR is an equity security holder, owning a 93%

membership interest in the Debtor. There is no dispute that M&T is greatly undersecured and

that its deficiency claim is by far the largest unsecured claim in the case. Even if LPR's argument

is correct on this point, and M&T has no security interest in the proceeds, the proceeds would go

first to the administrative expenses of the bankruptcy case, and then to unsecured creditors. In no

event would the proceeds fall down to LPR at the equity level of the Debtor's debt and equity

structure.

18

More fundamentally, the Court does not have to decide whether M&T has a perfected security interest in the proceeds of the stream credits, as the matter is before the Court on a motion to approve a settlement. The Court concludes that M&T has more than a good faith argument that it has a perfected security interest in the proceeds of the stream credits. Its Credit Line Deed of Trust provides it with a security interest in all "environmental permits," "governmental approval letters," "water approvals," and all "privileges, rights, tenements, hereditaments, appurtenances, and all other estate, right, title and interest of the Grantor." M&T Ex. 5, p. 2. Its Assignment of Interests grants a security interest in all "Profits and Permits," as well as in all "government consents, licenses and approvals." M&T Ex. 6, ¶¶ 1 and 5. A Declaration must be recorded in the land records evidencing the landowner's obligations, which is an encumbrance that runs with the land. It is hard for the Court to imagine something that is more tied to the land than the use and preservation of a stream that runs through the middle of the property.

LPR's position would invite litigation with M&T over this issue, litigation in which M&T has more than a fair probability of success. Further, the Debtor has no money with which to fund any such litigation. Approval of the settlement, on the other hand, not only will avoid any further litigation expenses, it will net 20% of the stream credit proceeds for the estate (after a holdback of 10% for the required bond with the Army Corps of Engineers), which will enable the Debtor to pay its administrative expenses and return something to the unsecured creditors.

Further, the Debtor will gain an easement for the 313 acre parcel as a result of the settlement. The importance of access to the 313 acre parcel cannot be overstated, with respect to this property. It is otherwise landlocked, and the Debtor would be required to enter into costly

litigation with other landowners in order to establish an easement by necessity, which again, would be uncertain of result.

LPR asserts that the access easement will be granted as a result of the settlement, and the Leggett Foundation might then pull its property out of Loudoun Heights for $1.00. *See* Loudoun Heights Operating Agreement, LPR Ex. 5, ¶ 2.4; Amended and Restated Operating Agreement, Debtor's Ex. J, ¶ 2.4. However, Leggett Foundation would need relief from the automatic stay before attempting to withdraw its property. 11 U.S.C. § 362(a)(3) ("any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate"). Further, the Court does not see how the access easement, which plainly benefits the Debtor's 313 acre parcel (in which LPR retains a 93% equity interest) harms LPR at all. The LPR properties are underwater relative to M&T's lien, so LPR cannot claim any financial harm accruing from the use of one of the LPR properties as the servient tenement for the benefit of the 313 acre parcel.

The Debtor, on the other hand, argues in part that the Court should approve the settlement because the 2008 Declaration has already been recorded and cannot be vacated without the consent of the Mitigation Bank Review Team (MBRT). *See* M&T Ex. 23, p. 4 ("after recording, these restrictive covenants may only be amended or vacated by a recorded document signed by the signatory members of the MBRT and the Owner or its successor in interest"). The Debtor argues that the 2008 Declaration is not subordinated to M&T's Deed of Trust. Effectively, the Debtor asserts that, at this point, it is stuck with LMB as the Sponor because of the previously recorded Declaration. LPR argues in response that the Court should give no weight to the 2008 Declaration because the Declaration was an unauthorized act on the part of Mr. Bane as Manager

20

of LPR. LPR argues that Mr. Bane did not have either the unanimous written consent of the Members, nor did he have the affirmative votes of 66% of the Members, as required by the LPR Amended Operating Agreement. *See* LPR Ex. 2, ¶ 3.2(ii); M&T Ex. 7 (entitled "Unanimous Written Consent of the Members and Managers in Lieu of Meeting of Little Piney Run Estates, LLC," but lacking Mr. Guyant's signature). The Debtor responds by arguing that the Declaration is not an encumbrance, asserting that the term "encumbrance" is limited to financing documents such as the M&T Deed of Trust. In the Court's view, LPR surely has the better argument on the definition of "encumbrance." The term encumbrance is broad enough to include the Declaration. *See* Black's Law Dictionary (9th Ed.) ("encumbrance" is "[a] claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage; any property right that is not an ownership interest").

Again, though, the Court is not called upon to finally decide this issue; rather, the Court is required to determine whether the settlement is in the best interests of the creditors and the estate. It is very possible that, notwithstanding the apparent weakness of its legal position as to whether the Declaration constitutes an "encumbrance," LMB could assert in litigation with the Debtor that the Declaration is not an encumbrance within the meaning of the Amended and Restated Operating Agreement for LPR. Alternatively, and more plausibly, LMB could argue that LPR is estopped some six years later from arguing otherwise. LPR already has conceded that too much time has passed to attack the transfer of its properties to Loudoun Heights as an unauthorized transfer. The Court does not see why the same defenses of laches and estoppel could not be raised by LMB in response to an attack on the validity of the Declaration, which was recorded in January 2008, before the transfer of the five LPR properties to Loudoun Heights.

21

Absent approval of the settlement, M&T will move for relief from the automatic stay. The Debtor has no funds with which to pay M&T any adequate protection payments and M&T is acknowledged by all parties to be significantly undersecured. M&T, therefore, would be entitled to relief from the automatic stay and would end up foreclosing on its collateral. Further, M&T would not be required to agree to subordinate its Deed of Trust to the proposed access easement over one of the LPR parcels, benefitting the 313 acre parcel. Absent approval of the settlement, the 313 acre parcel would remain landlocked indefinitely.

The Court finds that it is in the best interests of the creditors and the estate to enter into the settlement with M&T.

    B. *The Debtor's Corporate Authority to Enter into the Proposed Stream Credit Agreement.*

LPR next argues that the Debtor should not be permitted to enter into the revised Stream Credit Agreement with LMB because, now that LPR has been reinstated, the Debtor lacks corporate authority to do so. The Debtor counters that the Leggett Foundation, which was the sole member with the authority to vote at the time, both authorized Mr. Bane to enter into the proposed Stream Credit Agreement and adopted an Amended and Restated Operating Agreement that now requires 100% of the members to reverse course. *See* Amended and Restated Operating Agreement, Debtor's Ex. J, ¶ 3.1 (appointment of Mr. Bane as manager, who can only be removed by the affirmative vote of 100% of the members); ¶ 3.2 (prohibiting certain corporate actions without the affirmative vote of 100% of the members); ¶ 10.2 (providing that the Amended and Restated Operating Agreement can be further amended only by the affirmative vote of 100% of the members).

22

A comparison of the terms of the original Operating Agreement for Loudoun Heights and its Amended and Restated Operating Agreement is useful here. Section 3.1 previously required the affirmative vote of 75% of the members to remove a Manager or to appoint a new Manager. Section 3.1 in the Amended and Restated Operating Agreement, which appoints Mr. Bane as the sole Manager, now requires the affirmative vote of 100% of the members to remove Mr. Bane as Manager. The first paragraph of Section 3.2 is identical in both documents, except that in the Amended and Restated Operating Agreement Section 3.2 the following language is *added* to clarify the powers of the Manager to manage the business affairs of the company "… including filing bankruptcy, facilitating the sale of the stream credits, trail easements tax credits, conservation easement tax credits, and the sale of properties owned by Loudoun Heights, LLC." Debtor's Ex. J ¶ 3.2.[16]

Further, the following provisions in Section 3.2, which previously would have required the affirmative vote of 66% of the members, are now *deleted* in their entirety from Section 3.2 (using the sub-paragraph numbers from the original Operating Agreement):

> (iii)    Make, execute or deliver any deed, contract of sale, or other Instrument which operates to sell any portion of the Property or substantially all of the other assets of the LLC; [and]

> (viii)    Take any other action that requires the prior consent or approval of the Members either pursuant to the Act or the terms of this Agreement.

LPR Ex. 5 ¶ 3.2 (iii), (viii).

---

[16]  The term "Managers" also has been changed to "Manager" in the Amended and Restated Operating Agreement. This is because Mr. Leggett, who was appointed as a co-Manager in the original Operating Agreement, has resigned, and Mr. Bane was appointed in the Amended and Restated Operating Agreement as the sole Manager.

The upshot of all of this from the Debtor's perspective is clear: Mr. Bane is in charge, and there's nothing that LPR can do about it, without the Leggett Foundation's consent. Not surprisingly, LPR decries this as a backroom maneuver, the intent of which is to disenfranchise LPR from any decision making with respect to Loudoun Heights and its property. After all, LPR argues, it is the owner of the overwhelming majority of the equity interests in Loudoun Heights – 93%, to be precise. In the end, though, there is nothing illegal about the adoption of a 100% voting requirement. Virginia Code Sections 13.1-1022(B) and (C) provide as follows:

> (B) Unless otherwise provided in this chapter, in the articles of organization, or in an operating agreement, the members of a limited liability company shall vote in proportion to their contributions to the limited liability company, as adjusted from time to time, and a majority vote of the members of a limited liability company shall consist of the vote or other approval of members having a majority share of the voting power of all members.

> (C) Unless otherwise provided in this chapter, in the articles of organization, or in an operating agreement, any action required or permitted to be taken by the members of a limited liability company may be taken upon a majority vote of the members.

Va. Code §§ 13.1-1022(B), (C).

In other words, a limited liability company is to be governed by a majority of the votes of the members, unless the articles of incorporation or the operating agreement provide otherwise. Section 13.1-1023(B)(3) of the Virginia Limited Liability Company Act provides as follows, with respect to the amendment of operating agreements:

> If the articles of organization or the operating agreement provide for the manner by which an operating agreement may be amended, including by requiring the approval of a person who is not a party to the operating agreement or requiring the satisfaction of conditions, an operating agreement may be amended only in that manner or as otherwise permitted by law; provided that (i) the approval of any person may be waived by that person and (ii) any conditions may be waived by all persons for whose benefit the conditions were intended.

Va. Code §§ 13.1-1023(B)(3).

Here, the original Operating Agreement provided a method for its own amendment, the affirmative vote of 66% of the votes of the members. LPR Ex. 5, ¶ 3.2(vi). LPR, as a dissociated member at the time of the amendment, did not have the right to vote. Virginia Code §§ 13.1-1040.2(A) ("The former member or successor in interest shall continue to hold a membership interest and shall have the same rights that an assignee of the membership interest would have under subsection A of § 13.1-1039."); 13.1-1039(A) ("Except as provided in subsection A of § 13.1-1040, an assignment does not entitle the assignee to participate in the management and affairs of the limited liability company or to become or to exercise any rights of a member.")

The Amended and Restated Operating Agreement was approved by the only member that at the time had the ability to vote, the Leggett Foundation. This may seem to be unfair to LPR now, but it has to be remembered that LPR sat on its hands for over three years, from December 31, 2010, when its existence was terminated, to April 13, 2014, when it was reinstated, with LPR not even bothering to file the relatively simple paperwork required for reinstatement and seemingly being indifferent to the management of Loudoun Heights throughout its entire period of non-existence. It is not fundamentally unfair to subject LPR to the Amended and Restated Operating Agreement, at this point in the Debtor's existence.

The Court finds that the settlement and the proposed Stream Credit Agreement with LMB are validly authorized corporate acts of the Debtor.[17]

---

[17] LPR as a reinstated member, now has the right to vote its 93% membership interests in Loudoun Heights. The adoption of the seemingly impregnable 100% voting requirement in the Amended and Restated Operating Agreement may not prove to Mr. Bane's or the Leggett Foundation's liking in the end. This kind of provision may lead to irreversible deadlock, which can lead to a judicial dissolution (See Va. Code § 13.1-1047(A) (judicial dissolution to be ordered "if it is not reasonably practicable to carry on the business in conformity with the articles of organization and any operating agreement")), or to the appointment of a Chapter 11 trustee. *See In re FKF Madison Park Group Owner, LLC,* 2011 WL 350306, * 4 (Bankr. D. Del. 2011) ("If the deadlock continues, the Court may be compelled to appoint a Chapter 11 trustee"); *In re New Towne Development, LLC,* 404 B.R. 140, 149

### C. The Benefit to Insiders.

Finally, LPR argues that the settlement is fundamentally unfair because an insider, Mr. Bane's wife, will be materially benefitted. As noted, Ms. Bane is the 52.7% owner of LMB. Assuming that there are potentially 3,178 stream credits available to Loudoun Heights (*See* M&T Ex. 11, p. 2), and further assuming that the average value for Loudoun Heights' stream credits would be $400 per credit, this could result in approximately $1,271,200 in gross stream credit proceeds. One of M&T's Exhibits indicates that it might cost approximately $190,000 to monetize the stream credits. M&T Ex. 12. Assuming a 10% holdback for the bond, resulting in 45% of the stream credit proceeds going to LMB, Ms. Bane could stand to gain approximately $200,000 in recognition of her 52.7% interest in LMB (($1,271,200 x .45) - $190,000) x .527 = $201,335.08). M&T would end up with approximately $457,000 (($1,271,200 x .45) x .80 = $457,632), and the Debtor would end up with approximately $115,000 (($1,271,200 x .45) x .20 = $114,408).[18]

This is a serious objection. Any settlement benefitting an insider must be heavily scrutinized by the Court. *Pepper v. Litton*, 308 U.S. 295, 306 (1939) ("[insiders'] dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein"); *In re Gloria Mfg. Corp.,* 47 B.R.

---

(Bankr. M.D. La. 2009) ("The Shearwater membership dispute effectively has paralyzed New Towne's management, and necessitates installing a neutral third party to operate the debtor unhampered by its members' disagreements.")

[18]   There was a suggestion that another of Mr. Bane's relatives owns an additional interest in LMB. Ms. Bane's interest in LMB is enough for the Court to take this objection seriously.

370, 373 (E.D. Va. 1984). In *Gloria Mfg*., the court noted that although the court must give close

scrutiny to dealings between an insider and the corporation, there are no per se rules. 370 B.R. at

373. The Court held:

> Close scrutiny to dealings does not require automatic denial. A fiduciary or an insider
> may not enrich himself by breach of his trust, but it "is not mere existence of an
> opportunity to do wrong that brings the rule into play; it is the unconscionable use of the
> opportunity afforded by the domination to advantage itself at the injury (of others)—that
> deprives the wrongdoer of the fruits of his wrong."

*Id.* (citations omitted).

The 50/50 split between LMB as the Sponsor and the Debtor as the landowner is well

within the range suggested as being reasonable by the Debtor's expert, Mr. Norman. Mr. Norman

testified that, under the best of circumstances, a participant in a stream bank could not expect to

receive more than 55 to 60% of the proceeds. Mr. Bane testified that the other landowner

participants in the Pipken Site stream bank are only receiving 20% in recognition of their stream

credits.

The Court finds that, despite the benefit to the insider, the Debtor would not be able to do

better in the marketplace for stream bank credits with another sponsor. Further, if the Debtor

jettisoned its agreement with LMB, there is no suggestion in the evidence that it would be able to

create its own mini-stream bank using another sponsor, solely for its properties (recall that there

are other landowners who are in the Pipken Site stream bank who are contractually obligated to

LMB as the Sponsor.) And, there is no guarantee that LMB will go away without a fight, a fight

that this Debtor can ill afford. In effect, LPR is arguing that the stream bank deal – *any* stream

bank deal because practically speaking there are no other stream banks out there for this Debtor

– is a bad deal, and should not be approved. The Court finds that the Debtor's proposed stream

bank arrangement is a proper exercise of the Debtor's business judgment, notwithstanding the benefit to the insider.

Under the circumstances, the Court finds that the proposed settlement is well within the range of reasonableness for a settlement of this kind. The Court will enter the Debtor and M&T's proposed Order approving the Settlement Motion.

### Conclusion

For the foregoing reasons, it is hereby **ORDERED**:

1.       The Motion to Dismiss is denied.

2.       The Settlement Motion will be granted. The Court will enter the proposed Order approving the settlement, submitted jointly by the Debtor and M&T Bank.

3.       The Clerk will mail copies of this Opinion and Order, or provide cm-ecf notice of its entry, to the parties below.


Date: _Jun 26 2014_____        /s/ Brian F. Kenney_____
                                     Brian F. Kenney
Alexandria, Virginia                 United States Bankruptcy Judge

Entered on Docket: June 27, 2014

Copies to:

Joe Bane                             John J. Brennan, III, Esquire
12022 Meadowville Court              510 King Street, Suite 416
Herndon, VA 20170                    Alexandria, VA 22314
Debtor Designee                      Counsel for Little Piney Run Estates, LLC

Frank Bredimus, Esquire              Michael G. Gallerizzo, Esquire
Law Office of Frank Bredimus         Carl A. Howard, Esquire
16960 Ivandale Rd.                   GEBHARDT & SMITH LLP
Hamilton, VA 20158                   One South Street, Suite 2200
Counsel for the Debtor               Baltimore, Maryland 21202
                                     Counsel for M&T Bank

28

Bradley David Jones, Esquire
Office of the United States Trustee
115 South Union Street, Suite 210
Alexandria, VA 22314